## BECKNER et al. v. BARRETT.

### No. 11584.

Court of Civil Appeals of Texas. Dallas.
March 9, 1935.

Rehearing Denied April 6, 1935.

LOONEY, Justice.

W. F. Barrett sued Al C. and A. S. Beckner to recover $2,988.30, the amount alleged to be due for drilling a water well in the city of Sherman, on a lot under lease to A. S. Beckner, and to foreclose an alleged constitutional and statutory lien on the leasehold and the ice plant located thereon.

The nature of plaintiff's cause of action and defenses urged thereto will appear during the course of the discussion. On answers of the jury to special issues and findings made by the court, judgment was rendered for plaintiff for the sum of $2,131.25, foreclosing the alleged lien on said leasehold interest, and directing sale of same to satisfy the judgment. In due time, defendants moved to set aside the findings, to set aside and reform the judgment, to retax costs, and for a new trial, all of which were overruled and defendants excepted, gave notice of, and perfected, appeal.

The record discloses that, on April 11, 1932, the parties entered into the original contract, supplemented or amended on May 28, 1932, the provisions of same brought under review are these: The original contract recites: "Whereas, A. S. Beckner now has leased Lot No. 11, in Block No. X of the Alexander and Allen Addition to the City of Sherman, Texas, from C. C. Mayhew and J. A. Ladd for the purpose of building and installing an ice plant; and Whereas, Al C. Beckner has an interest in the operation of said ice plant and desires to have a well dug on said lot and premises to be used in connection with the operation of said ice plant. Now, therefore, the said Al C. Beckner, with the permission of the said A. S. Beckner, lessee of said lot, party of the first part, and W. F. Barrett, party of the second part, make and enter into the following contract and agreement, to-wit. * * *" The contract proceeded, obligating Barrett to drill and complete in a good and workmanlike manner the well to a depth of 850 feet, if necessary, to reach the second Woodbine sand, the well to be cased to a depth of at least 400 feet with 6⅝-inch casing, and the rest of the well to be cased with 5³⁄₁₆-inch casing; providing that, "after said well is completed and the casing set, said second party agrees to drill and complete said well in a good and workmanlike manner and to cut off all water above the said Woodbine or producing sand, and drill a straight hole. It is also understood and agreed by and between said parties that the said second par-

Head, Dillard, Maxey-Freeman & McReynolds, of Sherman, for appellants.

Webb & Webb, of Sherman, for appellee.

ty shall furnish all work and labor and supplies and machinery for the drilling and completion of said well, and the setting of the casing and pump, and in the bailing of said well. In consideration of the above the said first party agrees to pay to said second party for the drilling of said well at the rate of One and Fifty One Hundredths ($1.50) Dollars per foot; said payment to be made at the times and in the manner herein specified." The contract then provides the manner and time of payments, and proceeds: "It is further understood and agreed by and between the said parties that the first party shall furnish, at his own expense, all the six & ⅝ inch casing which is to be used in said well; and also the five & ³⁄₁₆ inch casing to be used in said well; and also said first party shall furnish, at his own expense, all necessary supplies for the installing of the pump in said well. * * * As a part of this contract the said A. S. Beckner guarantees to the said second party the full and faithful performance of this contract by the said Al O. Beckner, and agrees to and guarantees the payment of the cash payable to the second party, as per the terms of this contract, and also agrees and binds himself to sign and execute the promissory notes payable to the said second party by the terms of this contract."

After reciting the necessity for the purchase of a new drilling cable, the supplemental contract of May 28, 1932, reads: "(2) It is now agreed between both parties that party of first part purchase a new cable at a cost of $174.50 plus telephone calls and other expenses incurred in the purchase and transportation of said cable from Fort Worth to Sherman, Texas," providing for the payment of the cost of the cable out of the contract price for the well, after its completion, and contains the following additional provisions: "(4) That this contract become an amendment to the contract of April 11, 1932. (5) And the party of the second part agrees to complete said well through what is commonly called the second Woodbine sand containing water, and guarantees said well to furnish twenty gallons of water per minute. Second party agrees to complete well, and the installation of first party's pump and pipe within 10 days from May 28, 1932. The time that is required for second party to under ream and carry casing to a deeper depth than was agreed will not be included in the above mentioned 10 days. Second party agrees to employ and work a day and night crew on said well, and complete well in less than 10 days, if possible.

(6) Second party agrees to bail well until well becomes clear and satisfy first party after drilling through the first Woodbine sand that the water from the said first Woodbine sand is properly cut off from entering into casing and mixing with water of the second Woodbine sand."

On or about July 1, 1932, appellee moved his drilling rig from the premises, contending that he had drilled the well to a depth of 771 feet into the second Woodbine sand, and had completed same according to contract. Appellants denied this contention, and demanded that appellee return and resume drilling. There is a serious controversy at this point as to the terms and conditions on which appellee resumed drilling, but the fact remains that he did return and resume. During the second operation, the well was drilled to a depth of approximately 854 feet, but appellants contend that the well failed to produce water from the second Woodbine sand, and was therefore worthless.

The propositions urged for reversal will be considered in the order presented in appellants' brief.

The court submitted issue No. 17, as follows: "What do you find from a preponderance of the evidence to be the reasonable value of the work done by plaintiff during the second drilling operation," to which the jury answered: "$750.00."

Appellants assign error on the action of the court in overruling their objection to this issue and their motion to set aside the finding of the jury in answer thereto, the contention being that the amount found was in excess of the sum sued for; that, as the suit was based on a contract providing for the payment of $1.50 per foot for each foot drilled, the amount of recovery was limited by the contract; that it was error for the court to submit an issue as to the reasonable value of the work done during the second drilling operation; and, furthermore, that the issue was authorized by neither pleading nor evidence.

We cannot accept appellants' view that the issue was not properly raised by pleading and proof. As before stated, appellee's insistence was that he had finished the well according to contract, and, while the parties differ as to the terms and conditions on which drilling was resumed, appellee's contention is that appellants requested him to resume drilling, agreeing to pay $1.50 per foot for such extra drilling, and, in the alternative, alleged that appellants agreed to pay the reasonable value of such work and

to furnish the gasoline and oil necessary for drilling, that thereupon he returned and resumed drilling, under the instructions and supervision of appellants, and thereafter drilled to a depth of 410 feet, was ordered by appellants to pour concrete to such depth, to drill through same and to a further depth of 30 feet, to set 3-inch casing and pour 100 feet of concrete, drill through same and to a further depth of 24 feet, the well then being 854 feet deep. These allegations being supported by evidence, we think the submission was authorized both by pleading and evidence.

■ As stated above, the jury found $750 to be the reasonable value of the work done by appellee during the second drilling operation, and the same became a part of the judgment. Appellants contend that the amount found is $209 in excess of the sum claimed by appellee in his pleadings. The record discloses that this contention is correct, but this error alone would not require a reversal, as the judgment could be reformed in this respect.

■■ Special issue No. 6 reads: "Do you find from a preponderance of the testimony that the defendants failed to furnish the plaintiff casing as it was needed during the first drilling operations on the lease in question?" to which the jury answered: "Yes." Appellants objected to the issue and assign error, contending that, as the contract fixed no time limit for the delivery of casing, the law implies an obligation to furnish same within a reasonable time after request therefor; hence, in assuming that under the written contract appellants were obligated to furnish casing as needed, the court placed on them a greater burden and a higher duty than that imposed by law.

The pertinent provisions of the contract read: "It is further understood and agreed by and between the said parties that the first party (Al C. Beckner) shall furnish, at his own expense, all the six & ⅝ inch casing which is to be used in said well, and also the five & ⅜₁₆ inch casing to be used in said well; and also said first party shall furnish, at his own expense, all necessary supplies for the installing of the pump in said well." Appellee knew that casing was not on hand and would have to be procured by appellants from Dallas, after request therefor was made.

It seems to be well settled that, in the absence of a stipulation as to the time when an act is contracted to be performed, the law implies a reasonable time, and what will be considered a reasonable time will depend upon the nature and character of the thing to be done and the circumstances and difficulties attending its accomplishments. Hart v. Bullion, 48 Tex. 278; Texas Farm Bureau, etc., Ass'n v. Stovall, 113 Tex. 273, 253 S. W. 1101, 1106. The submission of the issue, in our opinion, was erroneous, as appellee may have needed casing before requesting appellants for same. After being requested, appellants had a reasonable time within which to make delivery, and in this manner the question as to the delivery of casing should have gone to the jury.

■ Special issue No. 7, to which appellants objected, reads: "Do you find from a preponderance of the testimony that such failure on the part of defendants to furnish the casing as needed, if you have so found, was negligence, as that term has been herein defined to you?"; the jury answered: "Yes." Appellants insist that the court erred in this submission, in that appellee's cause of action is based upon the alleged breach of a contract that fixed no time for the delivery of casing, nor was it either alleged or proven that appellants failed to deliver casing within a reasonable time after being requested so to do.

We sustain this contention. The failure of appellants to furnish casing according to contract, if they did, gave appellee an action for its breach; hence the submission of the issue as to negligence was confusing. This doctrine was announced by Chief Justice Huff of the Amarillo court in Pecos, etc., Ry. Co. v. Amarillo St. Ry. Co. (Tex. Civ. App.) 171 S. W. 1103, 1107, as follows: "In this case we interpret the pleading of the plaintiff to be one upon a suit for the breach of the contract, and in permitting the combustible material to accumulate from which fire was communicated to the bridge, and upon the agreement of the appellee to indemnify appellant against loss or damage so occasioned, the question of negligence is not involved in the consideration of this case. The court, by his charge, made the liability of the appellees to turn upon the question of the appellees' negligence to keep clear and prevent the accumulation of the rubbish. In this we think the court was in error. The jury may have found as a fact that the rubbish accumulated and that the fire was communicated to the bridge therefrom, yet have found that the appellee was not negligent in so permitting the trash to accumulate." Galveston, H. & S. A. R. Co. v. Hennegan, 33 Tex. Civ. App. 314, 76 S. W. 452; Wells, Stillwell

& Spears v. Mason (Tex. Civ. App.) 258 S. W. 914; Galveston, H. & S. A. R. Co. v. Landeros (Tex. Civ. App.) 264 S. W. 524; Hewitt v. Buchanan (Tex. Civ. App.) 4 S.W.(2d) 169, 175.

■ It follows from what has been said that the court also erred, in a manner vitiating the judgment, in submitting, as complementary to issue No. 7, issues Nos. 8 and 9, to which the jury answered that, by reason of the negligence of appellants in failing to fur-, nish casing as needed, additional work was required of appellee, of the reasonable value of $750. In this connection it ought to be said that the original contract between the parties abounds in such expressions as, "Second party agrees to drill and complete in a good and workmanlike manner a water well, * * * agrees to drill and complete said well, * * * and to cut off all water above the said Woodbine or producing sand * ´ * * ; that the second party shall furnish all work and labor and supplies and machinery for the drilling and completion of the said well, and the setting of the casing and pump, and in the bailing of said well." The supplemental contract provides that: "(6) Second party agrees to bail well until well be-, comes clear and satisfy first party after drilling through the first Woodbine Sand that the water from the said first Woodbine Sand is properly cut off from entering into casing and mixing with water of the second Woodbine Sand."

■ We think it obvious from these provisions that it was the duty of appellee, if in the course of drilling it became necessary to clear the well from all cave-ins, to pour cement and cut off water from the first Woodbine sand, and, for the accomplishment of such purposes, to furnish "all work and labor and supplies and machinery." Appellants, in our opinion, would not be liable for any of these, unless the necessity therefor was occasioned by their failure to furnish casing within a reasonable time after being requested for same.

■ Appellants claim as an offset the sum of $653.43, paid to and on behalf of appellee during the progress of drilling. Testimony of both Al C. and A. S. Beckner is undisputed and sustains this claim, but the jury found, in answer to appellants' requested issue No. 18; that they neither paid appellee anything nor expended any sum at his request for material during the progress of the drilling. However, ignoring this finding of the jury, the court found that during the progress of the first drilling operation appellants had paid to and for appellee the sum of $526.25, and allowed a credit for such amount.

Appellants assign error on the refusal of the court to set aside this finding, because contrary to undisputed evidence, also assign error on its action in overruling their motion to set aside and reform the judgment, because the same is based in part on an erroneous finding by the court as to the amount paid to and on behalf of appellee. The amount paid by appellants to and on behalf of appellee during the progress of the. drilling being undisputed, no issuable fact was presented. But, the question being submitted to, and erroneously found by, the jury against undisputed evidence, the court was authorized, especially under the provisions of article 2211, R. S., amended by Acts of 1931, 42d Leg. p. 119, c. 77, § 1 (Vernon's Ann. Civ. St. art. 2211) to ignore the finding and render judgment according to the undisputed evidence. However, in disregarding the finding of the jury, we think the court erred in failing to allow appellants credit for the full amount to which the undisputed evidence showed they were entitled. This error alone, however, would not require reversal of the case, as the judgment could be reformed.

■ Appellants challenge the correctness of findings by the court to the effect that Al C. Beckner owned an undivided half interest in the leasehold upon which foreclosure was sought and had, because said finding is against all the evidence on the subject; also challenge the correctness of the judgment foreclosing the alleged constitutional, statutory, contractor's, etc., lien on said premises; the contention being that the undisputed evidence and findings of the jury establish conclusively that A. S. Beckner was owner of the leasehold interest in the premises, that he was a married man, the head of a family, that the premises were exempt as his business homestead, and that the written drilling contracts between appellee and appellants were not acknowledged by A. S. Beckner and wife in the manner required by law to fix a lien on homestead property.

As heretofore shown, appellee alleged and sought foreclosure of the constitutional, contractor's, etc., lien upon the leasehold and the ice plant thereon. Appellants answered, setting up the homestead rights of A. S. Beckner in the property, and that the alleged lien did not exist. The original drilling contract was signed by both appellants, but not by the wife of A. S. Beckner, nor was it acknowl-

edged by any one, nor recorded. It contains recitals, to the effect that A. S. Beckner had leased the lot for the purpose of building and installing an ice plant thereon, that Al C. Beckner was interested "in the operation of said ice plant," and was desirous of having a well drilled on the lot, to be used in connection with the operation of the plant,· and that "Al C. Beckner, with the permission of said A. S. Beckner, lessee of the lot, party of the first part, and W. F. Barrett, party of the second part, make and enter into the following contract and agreement, to-wit [then follows other provisions of the original contract of April 11, 1932]." It appears that A. S. Beckner signed the drilling contract for the purpose of manifesting his permission for the well to be drilled on the lot, and to evidence the fact that he guaranteed the faithful performance of the contract by Al C. Beckner, guaranteeing payment to the driller, of promissory notes agreed to be given as a part of the consideration for the well. The second or supplemental contract of May 28, 1932, was executed alone by W. S. Barrett and Al C. Beckner, but was neither acknowledged nor recorded. The jury found, in answer to special issues submitted at the request of appellants, that A. S. Beckner was a married man and head of a family at the time of these transactions, that he leased the property and intended to use it as a place for the manufacture and sale of ice, that he entered upon and took possession of said premises on or before April 8, 1932 (before the drilling contract was executed), and began in good faith to prepare the same as a place for the manufacture and sale of ice, and that, after the plant was completed and in condition for use, he had used said premises, buildings, and improvements thereon as a place to exercise his calling as manufacturer and dealer in ice.

It is now definitely settled in this state that a homestead right will attach to a leasehold interest in land. See Wheatley v. Griffin, 60 Tex. 209; Phillips v. Warner (Tex. App.) 16 S. W. 423; Anheuser-Busch Brewing Ass'n v. Smith (Tex. Civ. App.) 26 S. W. 94; First Nat. Bank v. Dismukes (Tex. Civ. App.) 241 S. W. 199; Cry v. J. W. Bass Hardware (Tex. Civ. App.) 273 S. W. 347. While the Constitution, art. 16, § 50, authorizes the forced sale of homestead property for work and materials used in constructing improvements thereon, this can be done "only when the work and material are contracted for in writing, with the consent of the wife given in the same manner as is required in making a sale and conveyance of the homestead."

We think the evidence and the findings of the jury conclusively show that A. S. Beckner alone owned the leasehold, that it was his business homestead, and, as appellee failed to fix a lien thereon, as required by law, the court erred in the respect complained of by appellants.

■ Appellee was obligated by the supplemental contract to complete the well and install the pump and pipe within ten days from May 28, 1932. Appellants alleged a breach of this feature of the contract, and sought damages as an offset to appellee's claim. The jury found that appellee did fail to complete the well within the time agreed upon, but, in answer to a special issue framed for such purpose, found that his failure was not due to negligence, and, having so found, the jury was not required to ascertain the amount of damages, if any, appellants sustained by reason of such breach.

Appellants excepted to these submissions, because appellee's obligation to complete the well within the time mentioned was contractual, hence the claim for damages, if any existed, was for breach of the contract without regard to whether such breach resulted from negligence or from some other cause. We sustain this contention. We think appellants were entitled to have the issue submitted as to the amount of damages, if any, sustained by reason of appellee's failure to comply with the contract within the time stipulated, and this without regard to whether such failure resulted from negligence or from other causes. See Pecos, etc., Co. v. Amarillo Street Ry. Co. (Tex. Civ. App.) 171 S. W. 1103; Wells, Stillwell & Spears v. Mason (Tex. Civ. App.) 258 S. W. 914; Hewitt v. Buchanan (Tex. Civ. App.) 4 S.W.(2d) 169, 175.

■ In assignments 30 to 40, inclusive, appellants complained of the action of the court in excluding certain testimony of S. C. Knaur, Al C. Beckner, A. A. Smith, and A. S. Beckner. We sustain these assignments, but do not deem it necessary to mention in detail the nature of the excluded testimony. The testimony, in our opinion, was relevant, and tended to show circumstantially the depth to which appellee had drilled the well at the time he claimed the same had been completed, and whether the water-producing sand encountered was from the first or second Woodbine, and whether water from the first sand had been properly cut off from entering into the casing and mixing with the waters of the second Woodbine. These being controverted issues, evidence as to the characteristics and qualities of waters produced from the two

sands was, in our opinion, relevant as tending to support appellants' contentions with reference thereto.

■ In assignments Nos. 41 to and including 47, appellants complain of the action of the court in admitting over their objections the testimony of certain witnesses as to the competency, care and skill, as drillers, of appellee and members of his crew; the contention being that the issue was, not whether appellee and his employees were careful, skilled, or competent drillers, or even whether they exercised care and skill, but whether appellee completed the well according to contract, and that the evidence admitted over objection was prejudicial and calculated to divert the minds of the jury from the real issues. Appellants' allegations in paragraph 11 of their amended original answer constitute, in effect, an impeachment of the skill and competency of appellee and his drillers, culminating in a charge that "the plaintiff and his employes engaged in said drilling operations were unskilled, incompetent and ignorant of the proper methods which should be employed in drilling said well in a good and workmanlike manner." These allegations are substantially supported by the testimony of A. S. Beckner, climaxed by the statement that appellee was "very incompetent." We recognize as correct the rule contended for by appellants, i. e., that ordinarily character evidence, of the nature of that under consideration, is not admissible to bolster the testimony or strengthen the case of a party, but, where pleadings or evidence impeach the skill, care, or competency of a party involved, as in the instant case, character evidence, in our opinion, is admissible in rebuttal under the rule announced in Jones on Evidence (Ed. De Luxe) p. 192, § 171, as follows: "In determining whether questions are relevant or not the judge should take into consideration not only the issues as shown by the pleadings, but also the line of proof which has been resorted to by the respective parties. Testimony which would be clearly irrelevant or incompetent if offered by one party in the first instance may become very pertinent in rebuttal or explanation of evidence offered by the adversary."

■ In assignments Nos. 48 to 53, inclusive, appellants complain of the admission, over their objection, of the testimony of several witnesses, to the effect that Will Barrett, father of appellee and a member of his drilling crew, had done satisfactory work on other drilling contracts, the contention being that whether the work done by Will Barrett for other parties was satisfactory or unsatisfactory was not relevant to any issue in the instant case, and that the admission of such evidence was highly prejudicial. We sustain these assignments. The fact that Will Barrett had previously performed drilling contracts to the satisfaction of the parties served conduced in no way to prove that in the instant case the well had been drilled and finished according to the contract. The rule violated by the admission of the evidence in question was tersely stated by Judge Wheeler in Waul v. Hardie, 17 Tex. 553, 559, as follows: "That the defendant may have expressed himself well pleased with other work done by the plaintiff, and that it may have been well done, did not conduce in any degree to prove that the work done for the defendant was executed in a like workmanlike manner. It was not legal evidence of the manner in which the work in question had, in fact, been performed." Also see Davidson v. Swanson (Tex. Civ. App.) 24 S.W.(2d) 776, 777.

■ In fifty-fourth and fifty-fifth assignments, appellants contend that the court erred in overruling their motion to retax costs, contending that appellee procured the issuance and service of process for numerous witnesses who attended court but were not called upon to testify; also that witnesses were subpœnaed, who attended and testified, but whose testimony had no bearing on any issue in the case, and that witness fees and costs of the issuance and service of such process should have been taxed against appellee.

The statute, article 2056, R. S., provides that the successful party shall recover from his adversary all costs incurred, except as otherwise provided. Appellants do not challenge the good faith of appellee in procuring the issuance and service of process for the witnesses who were not called upon to testify, nor do they contend that more than two witnesses to any one fact were subpœnaed. No authority is cited by appellants in support of these assignments. We do not think they are well taken; hence are overruled.

■ In the fifty-sixth assignment, appellants complain of the refusal of the court to set aside the verdict of the jury and grant a new trial because of certain evidence developed since the trial of the cause.

We do not deem it necessary to pass upon this question, as the newly developed evidence will be available on a subsequent trial of the case.

Because of errors hereinbefore mentioned, the judgment of the court below is reversed and the cause remanded for further proceed-

ings not inconsistent with the views herein expressed.

Reversed and remanded.

## On Rehearing.

In the original opinion we said: "Appellee knew that casing was not on hand and would have to be procured by appellants from Dallas, after request therefor was made." In his motion for rehearing appellee challenges the correctness of this finding, stating: "We don't understand why the court should have made this finding. It is certainly no part of the contract, and no part of the evidence in the case. * * * There was no mention in the contract, nor in the evidence, as far as we have been able to find that the casing was not on hand. * * * This court says that it was contemplated that appellee should make request for this casing when needed. We do not know where the court got this idea. There is nothing in the contract to that effect. * * * This court holds that appellee was under obligation to notify appellants when the casing was needed, and to give him reasonable notice to bring it. This is foreign to every fact in the case. We insist that the trial court was not in error in submitting the issue as it was submitted."

It is true the written contract makes no mention of the fact that casing was not on hand and would have to be procured elsewhere, but we think the parol evidence abundantly sustains our finding to that effect. The record discloses that there were only 44 feet of casing on hand, but this belonged to Will Barrett, who said he contemplated selling it to appellants. Appellee testified: "I don't believe I was present when my father told Mr. Beckner he had better arrange to get some casing. Mr. Beckner went to Dallas to get the casing sometime Sunday. The casing was delivered on the job on Monday evening. * * * I think Mr. Beckner had already arranged about getting the casing. My father told him some folks that were down there (Dallas) that he could get the casing from, and told him to go and get it. * * * We talked to Mr. Beckner about the cave-in, * * * told him that we had been bothered from a cave-in, and that was the reason we ordered this casing. We ordered the casing on account of the cave-in. The reason we ordered the casing was because we discovered the cave-in, and just as soon as we ordered the casing he (Beckner) started after it Sunday morning." C. H. Livingston, one of the drillers on the job, said: "Mr. Bill Barrett asked Mr. Beckner for casing Saturday eve-

ning." Will Barrett testified: "We were waiting for casing. The company had ordered from Dallas; they had sold out or something; there was some delay, and he (Beckner) had to go to Dallas to close it, or something, before he could build the plant. Before we got down 400 feet, we had a conversation with Mr. A. S. Beckner. He said it looked like he couldn't go ahead and build the plant. That was on Wednesday. We were better than 300 feet then. I told him that I couldn't shut down until I had reached the depth of 400 feet, where I was supposed to go under the contract and set the 6⅝ inch casing. Nothing was said as to whether he would or would not have the casing there at that time. I told him that I would have to have casing; that it would cave in and require a lot more work to clean it out and get it started again. * * * It was Saturday afternoon, April 30, that I told him that we needed 6⅝ inch pipes. I told him when he asked me to shut down that I would have to have the pipes. I told him that I would have to have it if I shut down at 400 feet, because the well would cave in if I left it standing. I told him Saturday afternoon that I would have to have it at that time. I recommended to him generally as to where he could buy the pipe, and told him where to get it. I told him he could get the pipes from a man I had in mind at that time; 3,200 feet; used only a short time. That was the man that he went to get it from."

A. S. Beckner testified: "Mr. Barrett made no request for pipes until Saturday afternoon. He said he would need it soon, and I asked him when and told him I would have it back here. He said he would need it soon and I thought I had better get it on the ground. He recommended to me the parties to buy from, the Standard Pipe & Supply Company of Dallas. I went to Dallas in advance for the retention of it—arranged for it before that. I went to Dallas to get it on Sunday. * * * Mr. Barrett said that they were the best people in Dallas to buy pipes from, and said I could get good pipes and just as good as I could anywhere, and the pipes were used in oil wells, but it was not pitted or deteriorated." A. C. Beckner testified: "I remember when Mr. Barrett requested casing. It was on Saturday before I went to Dallas to get it on Sunday. He said he was going to need some casing, and in the conversation with him we talked about how we were going to get it, and we told him we would have to get a trailer and go to Dallas for it. That conversation, however, was a few days before we made the arrangements. On Saturday he

requested that we get ready to get it. He told us he was going to need the casing and we told him to let us know in plenty of time, so that we could arrange to go and get it. This was perhaps a couple of days before Saturday afternoon when he requested us to get the casing." This evidence, in our opinion, fully justified our finding.

Appellee contends that we erred in holding that A. S. Beckner had a homestead interest in the premises, because "he had not actually occupied and used this property for conducting his business when the contract (drilling) was made. If he ever so occupied it, it was after the contract was not only made, but completed."

This contention is against findings of the jury to the effect that A. S. Beckner was a married man, the head of a family; that he leased the property and intended to use it as a place to manufacture and sell ice; that he entered upon and took possession of the premises on or before April 8, 1932 (prior to the making of the drilling contract on April 11, 1932), began in good faith to prepare same as a place to manufacture and sell ice; and that, after the ice plant was completed and in condition for use, he had used the premises, buildings, and improvements as a place to exercise his calling as a manufacturer of and dealer in ice.

We have carefully considered all assignments urged by appellee for rehearing, but, seeing no reason to change our original holdings, the motion for rehearing is overruled.

Overruled.